# Exhibit E

  

*Via Secure Release Electronic FOIA Portal*

U.S. Customs and Border Protection
Freedom of Information Act Office
1300 Pennsylvania Avenue NW, Mail Stop 1181
Washington, D.C. 20229-1181

  **Re: Freedom of Information Act Request for DHS Policies and Practices Regarding the Collection and Use of Noncitizen DNA.**

Dear FOIA Office:

This is a request made under the Freedom of Information Act (FOIA) by the Center on Privacy & Technology at Georgetown University Law Center, Amica Center for Immigrant Rights,[1] and Americans for Immigrant Justice (collectively, "Requestors"). Requestors seek records from the Department of Homeland Security (DHS) regarding its policies and practices pertaining to the collection and use of noncitizen DNA data under 34 U.S.C. § 40702.

In 2005, Congress gave the executive branch the power to collect DNA from people detained "under the authority of the United States." *See* 34 U.S.C. § 40702. In 2020, the Department of Justice finalized a new regulation to mandate that agencies like CBP and DHS collect DNA from nearly all detained noncitizens and transmit the collected samples to the FBI to be analyzed and the resultant profiles stored in the FBI's Combined DNA Index System (CODIS), a biometric database. *See* 28 C.F.R. § 28.12.

Under this authority, DHS has subsequently engaged in the massive collection of non-citizen DNA, significantly increasing the overall amount of samples received by the FBI. *See* Ken Klippenstein, *FBI Hoovering up DNA at a pace that rivals China, holds 21 million samples and counting*, The Intercept (Aug. 29, 2023), https://theintercept.com/2023/08/29/fbi-dna-collection-surveillance/. Over $200 million of a recent bipartisan immigration bill sought funding for "expenses related to the analysis of DNA samples" including from noncitizens. Johana Bhuiyan, *'A privacy nightmare': the $400m surveillance package inside the US immigration bill*, The Guardian (Feb. 6, 2024), https://www.theguardian.com/us-news/2024/feb/06/us-immigration-bill-mexico-border-surveillance-privacy.

Records responsive to this request will significantly contribute to the public's understanding of DHS's DNA collection policy. 5 U.S.C. § 552(a)(4)(A)(iii). Similarly, given the significant risks

---

[1] Formerly known as Capital Area Immigrants' Rights (CAIR) Coalition.

associated with the mass collection of sensitive information contained in genetic material, the potential for misuse, and the costs of the program, there is an urgency to inform the public about an actual government activity. 5 U.S.C. § 552(a)(6)(E)(v)(II).

We therefore seek the expedited processing of this request and a fee waiver. *See* 5 U.S.C. §§ 552(a)(6)(E) and 552(a)(4)(A)(iii). We expect a response to this request within twenty working days in accordance with 5 U.S.C. § 552 (a)(6)(A)(i), unless otherwise allowed by the statute.

## I. Records Requested

We request that your office provide a copy of the following records for the period beginning :

1) Records reflecting all locations where CBP-collected noncitizen DNA samples are stored.

2) Records reflecting all databases where CBP-collected noncitizen DNA profiles are stored.

3) Records documenting the workflow DHS officials follow when collecting, handling, and storing DNA samples from noncitizens detained under the authority of the United States.

4) All policies, procedures, memoranda, and other guidance regarding the implementation of DNA collection from noncitizens detained under the authority of the United States. This includes (but is not limited to):

   a. All records reflecting how a noncitizen's DNA information can be accessed, searched, indexed, probed, and/or otherwise utilized by DHS officials.

   b. All records reflecting how a noncitizen's DNA information can be accessed, searched, indexed, probed, and/or otherwise utilized by other government agencies.

   c. All guidance on appropriate use(s) of a noncitizen's DNA sample.

   d. All guidance on inappropriate use(s) of a noncitizen's DNA sample.

   e. Any records reflecting the procedure(s) for expungement of a noncitizen's DNA profile and sample in any and all databases.

   f. The number of requests received for expungement since January 2021; and

   g. Records reflecting the aggregate outcomes of these requests (i.e., how many expungements took place and how many requests did not result in expungement).

5) Any and all records reflecting the legality of and/or legal justification for DHS's DNA collection program under 34 U.S.C. § 40702 and/or 28 C.F.R. § 28.12 including, but not limited to, guidance and memoranda.

6) All training materials and presentations relating to DHS's collection, processing, use, and storing of noncitizen DNA.

7) Any and all records reflecting the annual costs of DNA collection since the program's implementation.

8) Any and all records reflecting any DHS efforts to expand its capacity or ability to collect and store noncitizen DNA.

9) Any and all records relating to noncitizen non-cooperation with DNA collection including, but not limited to, expulsions, deportations, prosecutions, imposition of penalties, and any DHS referrals to the DOJ for prosecution under 34 U.S.C. § 40702(a)(4)-(5).

10) Any and all records reflecting all geographic locations where DHS collects noncitizen DNA under 34 U.S.C. § 40702 as of the date of processing of this request.

11) Any and all records reflecting the demographic makeup of individuals whose DNA was collected under the rule including (but not limited to):

    a. Country of origin

    b. Race/Ethnicity

    c. Age

    d. Immigration status/classification

    e. Location where DNA was collected

    f. Date DNA was collected

    g. Position and/or title of DHS or other Federal Official who collected the individual's DNA.

**Please note** that we do **not** request personally identifiable information on any individuals and consent, in advance, to its redaction as appropriate under (b)(6) as it pertains to this paragraph. Additionally, requesters do not seek the names or contact information of individuals or other exempt personal identifiable information of people referenced in the records requested herein. If any of the requested records contain exempt personal identifiable information, Requesters ask that said personal identifiable information be redacted to ensure the maximum production of responsive relational information contained within the records. Nothing in this request should be construed as a waiver of Requesters' right to challenge any redactions made on the basis of personal identifiable information, including in the event of litigation regarding this FOIA request.

## II.     Format for Production of Records

Please disclose all records in connection with this FOIA request in electronic form, where possible, in their native electronic format. Please include Bates numbering on all produced records.

### III.   Requestor Information

Founded in 2014, the Center on Privacy & Technology at Georgetown Law is a think tank focused on privacy and surveillance law and policy. The Center brings Georgetown Law's legal expertise to bear on privacy debates in federal and state legislatures, regulatory agencies, and the academy. The Center has been training Georgetown Law students to be leaders in privacy practice, policymaking, and advocacy. Georgetown University, of which the Center is a part, is a 501(c)(3) organization.

Amica Center is a 501(c)(3) nonprofit organization that provides legal services to noncitizens in DHS custody, including services administered through the Executive Office of Immigration Review's Office of Legal Access Programs. Amica Center's mission is to ensure equal justice for all immigrant adults and children at risk of detention and deportation in the D.C. region and beyond through direct legal representation, know-your-rights presentations, impact litigation, advocacy, and the enlistment and training of attorneys to defend immigrants. We are driven in our pursuit of a vision for equal justice for all immigrants at risk of detention and deportation by our understanding of the grave human costs of the American detention and deportation system.

Americans for Immigrant Justice (AI Justice) is a 501(c)(3), tax-exempt, nonprofit, charitable legal services organization. AI Justice's work encompasses advocating for the basic human rights of immigrants through direct representation, policy reform, impact litigation, and public education.

### IV.   Request for a Waiver of Fees

Requestors ask DHS to waive all fees associated with this request. A fee waiver is warranted on the grounds that disclosure of the information contained in the requested records is in the public interest and is "like to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requestor[s]." 5 U.S.C. § 552(a)(4)(A)(iii); 28 C.F.R. § 16.10(k)(1). Disclosure is in the public interest because it will assist the public in understanding the extent and means of implementing DNA collection of noncitizens as well as how this information is stored and used. None of the requestors has a commercial interest in any of the requested records.

Requestors also seek a limitation of search and review fees as "representatives of the media" pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) ("fees shall be limited to reasonable standard charges for document duplication when records are not sought for commercial use and the request is made by . . . a representative of the news media") and 28 C.F.R. § 16.10(c)(1)(i) (search fees shall not be charged to "representatives of the news media").

Requestors are all representatives of the news media within the meaning of the statute and applicable regulations. *See* 5 U.S.C. § 552(a)(4)(A)(ii) (defined as "any . . . entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience,"); *Nat. Sec. Archive v. Dep't of Defense*, 880 F.2d 1381, 1397 (D.C. Cir. 1989) (same); *Electronic Privacy Info. Ctr. V.*

4

*Dep't of Defense*, 241 F. Supp. 2d 5 (D.D.C. 2003) (non-profit that published information in a wide variety of sources on topics of privacy and civil liberties qualified as a representative of news media for FOIA purposes).

The statutory definition does not require that the requestor be a member of the traditional media. "[A]s methods of news delivery evolve (for example, the adoption of the electronic dissemination of newspapers through telecommunications services), such alternative media shall be considered to be news-media entities." 5 U.S.C. § 552(a)(4)(A)(ii); *see also Cause of Action v. F.T.C.*, 799 F.3d 1108, 1125 (D.C. Cir. Aug. 25, 2015) (disagreeing "with the suggestion that a public interest advocacy organization cannot satisfy the statute's . . . criterion" and remanding for reconsideration). Accordingly, courts have found that non-traditional news media outlets (such as, for example, the ACLU—a nationwide nonprofit civil rights organization) can qualify as representatives of the news media for the purposes of FOIA. *See ACLU of Washington v. Dep't of Justice*, No. C09-0642RSL, 2011 WL 887731, at *10 (D. Wash. Mar. 10, 2011) (finding that the ACLU qualifies as a "representative of the news media") *recons. on other grounds*, *ACLU v. Dep't of Justice*, 2011 WL 1900140 (D. Wash. May 19, 2011).

The Center on Privacy & Technology constitutes a representative of the news media because the request supports the Center's "news-dissemination function." 6 C.F.R. § 5.11(b)(6). Like other organizations whose primary functions include public education and advocacy, the Center on Privacy & Technology constitutes a "representative of the media" because it "actively gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." Id. See Elec. Privacy Info. Ctr. v. DOD, 241 Supp. 2d 5, 11 (D.D.C. 2003); Nat'l Sec. Archive, 880 F.2d 1381, 1387 (D.C. Cir. 1989). The Center on Privacy & Technology has published numerous reports, blog posts, and newsletters detailing issues of public concern in the areas of privacy and technology.[2] The Center on Privacy & Technology has also hosted several educational conferences open to and attended by the public.[3] Similarly, Amica Center and AI Justice each routinely publish reports, social media posts, and training materials educating the public about issues affecting noncitizens' rights in immigration detention, removal proceedings, and beyond.[4]

Requestors will also circulate a summary of the information disclosed through this request to various internal and external listservs with audiences in the thousands. Requestors have no

---

[2] *See Publications*, Center on Privacy & Technology, https://www.law.georgetown.edu/privacy-technology-center/publications/; *Center on Privacy & Technology Blog*, https://medium.com/center-on-privacy-technology

[3] *Events*, Center on Privacy & Technology, https://www.law.georgetown.edu/privacy-technology-center/events/.

[4] *See News & Stories*, Amica Center, https://amicacenter.org/news-and-stories/; *Tools & Guides*, Amica Center, https://amicacenter.org/legal-resources/tools-guides/; *Reports*, AI Justice, https://aijustice.org/reports/; *Advocacy*, AI Justice, https://aijustice.org/advocacy/.

commercial interest in the information sought under this FOIA request and can make the information publicly available.

Disclosure of the requested information also will contribute to the "understanding of a reasonably broad audience of persons." 6 C.F.R. § 5.11(k)(2)(iii). Apart from enhancing the public's understanding of the program, the requested information will be used to better equip practitioners to advise noncitizen clients about DNA collection and use—both at legal service providers such as Amica Center and AI Justice, as well as other pro bono organizations. As a provider of legal services to detained non-citizens, Amica Center and AI Justice have the necessary expertise, capacity, and intention to review, analyze, and synthesize this information and make it accessible to a broad range audience of attorneys and noncitizens navigating the U.S. immigration system.

The Center on Privacy & Technology also is an educational institution within the meaning of 6 C.F.R. § 5.11(b)(4) because it is affiliated with the Georgetown University Law Center, as one of several centers and institutes tasked with producing "cutting-edge research and indispensable policy resources," while "educating the leaders of tomorrow."[5] As such, we are not subject to search fees. 6 C.F.R. § 5.11(c)(1)(i), (d)(1).

Given that FOIA's fee waiver requirements are to be "liberally construed in favor of waivers for noncommercial requesters," a waiver of all fees is justified and warranted in this instance. *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) (quotation omitted).

If DHS will not grant a fee waiver to requestors, please notify us in advance if the fees will exceed $50.00.

### V.     Request for Expedited Processing

Requestors seek Track 1 expedited treatment for this FOIA request. There is a compelling need for expedited processing, both because there is an "urgency to inform the public concerning the actual or alleged Federal Government activity," and because that activity is "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence. 5 C.F.R. 5.5(e)(ii), 5.5(e)(iv).

First, there is an urgency to inform the public concerning DHS's extensive expansion of collecting noncitizen DNA because, as discussed in the introduction, it not only represents a serious threat to the right to privacy but also involves significant public spending. Klippenstein, *supra* at 1; Bhuiyan, *supra* at 1 (Over $200 million of a recent bipartisan immigration bill sought funding for "expenses related to the analysis of DNA samples" including from noncitizens). These costs are not exclusive to DNA collection by DHS. The FBI, in its 2024 budget request to

---

[5] *Explore Centers & Institutes*, Georgetown Law, https://www.law.georgetown.edu/experiential-learning/centers-institutes/explore-centers-institutes/.

Congress, sought to nearly double its budget for processing DNA samples, asking for $53.1 million in addition to its existing allotment of $56.7 million. *See* Fed. Bureau of Investigation, *FY 2024 Budget Request,* https://www.justice.gov/d9/2023-03/fbi_fy_24_pb_bud_sum_ii_omb_cleared_3-08-23.pdf. Furthermore, there is no clear procedure by which people who are subjected to DNA collection under 34 U.S.C. § 40702 and/or 28 C.F.R. § 28.12 can have their DNA samples and related records expunged. This strongly suggests that, in addition to the resources devoted to DNA collection and analysis, the government also dedicates considerable public dollars to the retention of collected DNA samples. Second, how noncitizen DNA is collected, stored, and used by DHS is a matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence. Since the restoration of federal agencies' authority to collect DNA from noncitizens was proposed in 2019, there have been countless articles published by journalists and non-profit organizations about DNA collection by DHS components, including CBP:

- Megan Molteni, *How DNA Testing at the US-Mexico Border Will Actually Work*, WIRED (May 2, 2019),

- Caitlin Dickerson, *U.S. Government Plans to Collect DNA from Detained Immigrants*, N.Y. Times (Oct. 2, 2019), https://www.nytimes.com/2019/10/02/us/dna-testing-immigrants.html

- Camilo Montoya-Galvez, *U.S. Collecting DNA Samples from Some Migrants – Including Teens – In First Stage of Program*, CBS News (Jan. 7, 2020), https://www.cbsnews.com/news/us-collecting-dna-samples-from-migrants-including-children-first-stage-of-program/.

- Daniel I. Morales, Natalie Ram & Jessica L. Roberts, *DNA Collection at the Border Threatens the Privacy of All Americans*, N.Y. Times (Jan. 23, 2020), https://www.nytimes.com/2020/01/23/opinion/dna-collection-border-privacy.html.

- Alex Ellerbeck, *Trump Plans to Collect DNA from Nearly a Million Immigrant Detainees*, Ctr. for Public Integrity (Jan. 31, 2020), https://publicintegrity.org/inequality-poverty-opportunity/immigration/trump-plans-to-collect-dna-from-nearly-a-million-immigrant-detainees/.

- Nicole Narea, *The U.S. Is Expanding Its Collection of DNA from Immigrant Detainees for a Federal Criminal Database*, Vox (Mar. 6, 2020), https://www.vox.com/policy-and-politics/2019/10/3/20895459/dna-test-immigrant-detention-criminal-database.

- Merrit Kennedy, *Trump Administration Poised To Start Collecting DNA From Immigration Detainees*, NPR (Mar. 6, 2020),

- https://www.npr.org/2020/03/06/812940401/trump-administration-poised-to-start-collecting-dna-from-immigration-detainees.

- Betsy Woodruff Swan & Daniel Lippman, *DHS Begins Collecting DNA from Undocumented Immigrants After Whistleblower Complaints*, Politico (May 15, 2020), https://www.politico.com/news/2020/05/15/dhs-dna-whistleblower-immigrants-260097

- Brian Cross, *Alarm Expressed Over U.S. Plan to Take DNA Samples from Those Detained at Border*, Windsor Star (Oct. 8, 2020), https://windsorstar.com/news/local-news/alarm-expressed-over-u-s-plan-to-take-dna-samples-from-those-detained-at-border.

- Adolfo Flores, *U.S. Border Officers Are Collecting DNA From Asylum-Seekers Even Though They Don't Have Criminal Records*, BuzzFeed News (June 4, 2021), https://www.buzzfeednews.com/article/adolfoflores/asylum-seekers-dna-us-border.

- Neel Agarwall, *Collecting DNA from Asylum Seekers at the Border Raises Privacy Concerns*, Immigration Impact (June 10, 2021), https://immigrationimpact.com/2021/06/10/collecting-dna-asylum-seekers-border/.

In recent years, there has been further coverage of the impact of the continued expansion of DHS's DNA collection practices.

- Danielle Prokop, *U.S. continues to take DNA samples from asylum seekers at the border*, Source New Mexico (June 8, 2023), https://sourcenm.com/2023/06/08/u-s-continues-to-take-dna-samples-from-asylum-seekers-at-the-border/.

- Nina Wang, *Migrants' DNA Is Fueling a Massive Expansion of the FBI's Genetic Database*, Mother Jones (Sept. 20, 2023), https://www.motherjones.com/politics/2023/09/migrants-dna-is-fueling-a-massive-expansion-of-the-fbis-genetic-database/.

- Saira Hussain & Matthew Guariglia, *The U.S. Government's Database of Immigrant DNA Has Hit Scary, Astronomical Proportions*, Elec. Frontier Found. (Sept. 25, 2023), https://www.eff.org/deeplinks/2023/09/us-governments-database-immigrant-dna-has-hit-scary-astronomical-proportions.

- Andrea Castillo, *Feds collected DNA from 1.5 million migrants in less than four years report finds*, L.A. Times (May 21, 2024), https://www.latimes.com/politics/story/2024-05-21/feds-collected-dna-of-1-5-million-migrants-report-alleges.

- Nick Mordowanec, *Migrant DNA Flooding Criminal Investigation Database*, Newsweek (May 21, 2024), https://www.newsweek.com/dna-migrants-immigration-biden-trump-dhs-1903131.

- Andrew Paul, *Law enforcement collected over 1.5 million people's DNA since 2020*, Popular Science (May 21, 2024), https://www.popsci.com/science/dna-database-study/.

- *El Gobierno recopila muestras de ADN de 1.5 milliones de immigrantes en menos de cuatro años, según informe*, Telemundo (May 21, 2024), https://www.telemundo.com/noticias/noticias-telemundo/inmigracion/el-gobierno-ha-recopilado-muestras-de-adn-de-15-millones-de-inmigrante-rcna153271.

This widespread coverage highlights how DHS collects DNA from primarily people of color, without giving informed consent and without following the procedural rules that the Constitution requires law enforcement to follow before taking a person's DNA. As the public continues to learn that law enforcement agencies entrusted with promoting public safety are exposing the public, and especially immigrants and people of color, to privacy and civil rights violations by surreptitiously collecting and sharing DNA information, public confidence in the government's integrity will undoubtedly continue to erode.

The undersigned certify that this explanation is true and correct, to the best of their knowledge and belief. 5 U.S.C. § 552(a)(6)(E)(vi); 6 C.F.R. § 5.5(e)(3).

## VI.     Address for Production or Response

Please respond and furnish any information and documents as soon as they are identified to:

Stevie Glaberson at skg43@georgetown.edu; Daniel Melo at Daniel.Melo@amicacenter.org; and Evelyn Wiese at ewiese@aijustice.org.

Requestors reserve the right to appeal a decision regarding denial of fee waiver or expedited processing, as well as any redactions or withholding of documents. Requestors look forward to your response to your request.

Thank you in advance,

*/s/ Stevie Glaberson*

Stevie Glaberson
Director of Research & Advocacy
Center on Privacy & Technology
Georgetown University Law Center

/s/*Daniel Melo*

Daniel Melo
Senior Attorney
Immigration Impact Lab
Amica Center for Immigrant Rights

9

/s/ Evelyn Wiese

Evelyn Wiese
Staff Attorney
Litigation Program
Americans for Immigrant Justice

10